**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ELLEN GRAY, as personal representative of the
ESTATE OF HENRY GRAY,

        Plaintiff,

    v.

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the
BROWN AND WILLIAMSON TOBACCO
CORPORATION and the AMERICAN TOBACCO
COMPANY; PHILIP MORRIS USA, INC.; and
LORILLARD TOBACCO COMPANY,

        Defendants.

Case No.: 3:09-cv-13603-WGY-HTS

JURY DEMAND

## AMENDED COMPLAINT

Ellen Gray, as personal representative of the Estate of Henry Gray, hereby sues Defendants as follows:

## JURISDICTION

1.     This Court has determined it has subject matter jurisdiction pursuant to the Class Action Fairness Act (CAFA) as a removed mass action pursuant to 28 U.S.C. §1332(d).

## VENUE

2.     Venue is in this District pursuant to Defendants' Motion to Remove this case to the Middle District of Florida and pursuant to the Court's denial of Plaintiff's Motion to Remand based on Plaintiff's opposition to removal of this case under CAFA.  Henry Gray primarily resided in Alachua County in the Northern District of Florida during the relevant time.

**RELIEF SOUGHT**

3.     This complaint seeks compensatory and punitive damages in accordance with the Florida Wrongful Death Act, the Florida Survival Statute, and with the Florida Supreme Court's class action decision and mandate in *Engle v. Liggett Group, Inc.*, 945 So.2d 1246 (Fla. 2006).

**PLAINTIFF**

4.     Henry Gray, hereafter "Decedent," was a citizen and/or resident of the State of Florida who was addicted to cigarettes containing nicotine, and as a result of such addiction, suffered from Coronary Heart Disease, Lung Cancer, Chronic Obstructive Pulmonary Disease (COPD), and/or other *Engle* diseases and/or other smoking-related illnesses within the time frames defined by the *Engle* Court, and otherwise was a member of the *Engle* class.  Decedent suffered from and/or died from one or more *Engle* diseases on June 30, 1995.

5.     Henry Gray was addicted to cigarettes manufactured by Defendants, relied to his detriment on Defendants' lies and omissions about the health effects and addictive nature of smoking, and, despite efforts to quit smoking, developed Coronary Heart Disease, Lung Cancer, COPD, and/or other *Engle* diseases and/or other smoking-related illnesses as a result of Defendants' wrongful conduct.

6.     The named personal representative[1] of the Estate is Ellen Gray, hereafter "Plaintiff," the wife of Henry Gray, and brings this claim on behalf of the Estate of Decedent and any survivors that qualify under the Florida Wrongful Death Act.  Independently and alternatively, Plaintiff asserts injury claims for survival damages pursuant to Section 46.021, Florida Statutes.

---

[1] To the extent Ellen Gray has not been formally appointed as Personal Representative of Henry Gray's Estate, she is undertaking good faith efforts to promptly obtain letters of administration. Pursuant to Fla. Stat. § 733.601, the appointment of Ellen Gray as Personal Representative will relate back to the filing of this complaint.

7.    The potential beneficiaries of a recovery in this action and the relationship to the Decedent are as follows:

| NAME | RELATIONSHIP |
|------|--------------|
| Ellen Gray | Wife |

**DEFENDANTS**

8.    Defendants R.J. REYNOLDS TOBACCO COMPANY as R.J. REYNOLDS TOBACCO COMPANY;  R.J. REYNOLDS TOBACCO COMPANY as Successor in Merger to BROWN AND WILLIAMSON CORPORATION and THE AMERICAN TOBACCO COMPANY; PHILIP MORRIS USA, INC.; and LORILLARD TOBACCO COMPANY are manufacturers of cigarettes, or their successors/predecessors are manufacturers of cigarettes, and they are corporations doing business in Florida who, at times material to this action, designed, manufactured, advertised, marketed, and sold tobacco products for human consumption which proximately caused injury to Decedent.

9.    Defendant Philip Morris USA is a citizen of Virginia with its principal place of business in Richmond, Virginia.

10.    Defendant R.J. Reynolds Tobacco Company is a citizen of North Carolina with its principal place of business in Winston-Salem, North Carolina.

11.    Defendant R.J. Reynolds Tobacco Company is the successor to Brown & Williamson Tobacco Corporation's United States cigarette business, and Brown & Williamson Tobacco Corporation was the successor by merger to the American Tobacco Company.

12.    Defendant R.J. Reynolds Tobacco Company is legally responsible for the conduct of both the American Tobacco Company and Brown & Williamson Tobacco Corporation and for

any harm caused by cigarettes manufactured by American Tobacco Company and Brown & Williamson Tobacco Corporation.

13.     Defendant Lorillard Tobacco Company is a citizen of North Carolina with its principal place of business in Greensboro, North Carolina.

14.     Defendants were at times relevant participants in the actions and conduct of non-parties Council for Tobacco Research -- USA, Inc. (The "Council"); the Tobacco Institute, Inc. (The "Institute"); and the Tobacco Industry Research Council, Inc. ("TIRC").

## GENERAL ALLEGATIONS

**A.      Defendants' Cigarettes Manufactured During the Relevant Period Were Needlessly And Powerfully Addictive.**

15.     Smoking is highly addictive.

16.     Nicotine is the addictive drug in cigarettes.

17.     Addiction is a chronic, relapsing brain disease that is characterized by compulsive drug seeking and use, despite harmful consequences.

18.     Addiction is considered a brain disease because drugs change the brain; they change its structure and how it works.

19.     The pharmacologic and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine.

20.     Nicotine addiction is the fundamental reason that individuals persist in using tobacco products.

21.     Persistent tobacco use contributes to many diseases.

22.     For most smokers, tobacco use is an addiction.

23.     Smoking is not usually a choice.

24.     It only takes 10 seconds for the nicotine from one puff of smoke to reach the brain.

25.     This rapid delivery of nicotine from the lungs to the brain is one of the reasons that cigarettes are so addictive.

26.     And once it gets there, nicotine causes cells in the brain to release dopamine.

27.     One of the effects of dopamine released in the brain is to create a heightened sense of alertness and contentment.

28.     Over time, the brain cells of smokers are changed to expect the regular bursts of extra dopamine that result from smoking. When a smoker tries to quit, these brain changes cause strong cravings for more nicotine.

29.     Nicotine addiction makes it difficult to quit smoking.

30.     Nicotine addiction keeps people smoking longer, and the longer they smoke, the more damage they do to their bodies.

31.     During the relevant period, Defendants intentionally designed cigarettes with enough nicotine to create and sustain addiction.

32.     The Defendants' business records reveal that their brands were engineered in ways that would make it harder to stop smoking.

33.     The Defendants' internal business records also reveal that Defendants knew that most of their customers would stop smoking if they could do so easily which would put their businesses at risk.

34.     Cigarette companies control the impact and delivery of nicotine in many ways, including designing filters and selecting cigarette paper to maximize the ingestion of nicotine, adding ammonia to make the cigarette taste less harsh, and controlling the physical and chemical make-up of the tobacco blend.

35.     At all relevant times, Defendants controlled the level of nicotine in their cigarettes.

36.     Some of today's cigarettes are more addictive than those from earlier decades.

37.     In part, this is a result of chemicals added to today's cigarettes that cause the nicotine to reach the brain more quickly.

38.     Menthol reduces the harshness of the smoke and makes it easier to smoke—particularly for children and teens.

39.     Research suggests that children and adolescents may be sensitive to nicotine and can become addicted more easily than adults.

40.     The younger smokers are when they start, the more likely they are to become addicted, and the more likely that they will become heavily addicted.

41.     Many young people underestimate the power of nicotine addiction. About three out of four high school smokers will become adult smokers—even if they intend to quit in a few years.

**B.      The Scientific Evidence Is Incontrovertible: Inhaling Cigarette Smoke Is Deadly.**

42.      Since the first Surgeon General's Report in 1964, evidence has linked smoking to diseases of nearly all organs of the body.

43.      In the United States, smoking causes 87 percent of lung cancer deaths, 32 percent of coronary heart disease deaths, and 79 percent of all cases of chronic obstructive pulmonary disease (COPD).

44.      Women's disease risks from smoking have risen sharply over the last 50 years and are now equal to men's for lung cancer, COPD, and cardiovascular diseases.

45.      The number of women dying from COPD now exceeds the number of men.

46.      Evidence also suggests that women are more susceptible to develop severe COPD at younger ages.

47.      One out of three cancer deaths is caused by smoking.

48.      The 2014 Surgeon General Report concludes that smoking causes colorectal and liver cancer and increases the failure rate of treatment for all cancers.

49.      The 2014 report also concludes that smoking causes diabetes mellitus, rheumatoid arthritis and immune system weakness, increased risk for tuberculosis disease and death, ectopic (tubal) pregnancy and impaired fertility, cleft lip and cleft palates in babies of women who smoke during early pregnancy, erectile dysfunction, and age-related macular degeneration.

50.      In addition to causing multiple serious diseases, cigarette smoking diminishes overall health status, impairs immune function, and reduces quality of life.

51.     The relationship between cigarette smoking and health is one of the most studied subjects in the field of public health.  The Smoking and Health Data Base, maintained by the Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, is a bibliographic database which covers over thirty years of information and abstracts with over 62,000 items on smoking and health.  The medical literature is replete with extensive epidemiological studies, conducted over decades, comparing the disease and death rates of millions of smokers and nonsmokers.  Every relevant population and demographic grouping has been examined.  This body of literature has been reviewed and presented in Reports of the Surgeon General on Smoking and Health published in 1964, 1967, 1968, 1969, 1971, 1972, 1973, 1974, 1975, 1976, 1979, 1980, 1981, 1982, 1983, 1984, 1985, 1986, 1988, 1989, 1990, 1992, 1994, 1998, 2000, 2001, 2004, 2006, 2010, 2012, and 2014.

## C.     The Century-Long Epidemic Of Cigarette Smoking Has Caused An Enormous, Avoidable Public Health Catastrophe In The United States.

52.     Tobacco addiction remains a substantial problem in the United States and worldwide.

53.     Since the first Surgeon General's report on smoking and health was published 50 years ago, more than 20 million Americans have died because of smoking.

54.     Nearly half a million Americans die prematurely from smoking each year.

55.     More people die every year from smoking than from murder, AIDS, suicide, drugs, car crashes, and alcohol, combined.

56.     If current rates continue, 5.6 million Americans younger than 18 years of age who are alive today are projected to die prematurely from smoking-related diseases.

57.     Most of the 20 million smoking-related deaths since 1964 have been adults with a history of smoking; however, 2.5 million of those deaths have been among nonsmokers who died from diseases caused by exposure to secondhand smoke.

58.     More than 100,000 babies have died in the last 50 years from Sudden Infant Death Syndrome, complications from prematurity, complications from low birth weight, and other pregnancy problems resulting from parental smoking.

59.     Smoking rates among adults and teens are less than half what they were in 1964; however, 42 million American adults and about 3 million middle and high school students continue to smoke.

60.     Nearly half a million Americans die prematurely from smoking each year.

61.     More than 16 million Americans suffer from a disease caused by smoking.

62.     On average, compared to people who have never smoked, smokers suffer more health problems and disability due to their smoking and ultimately lose more than a decade of life.

63.     The estimated economic costs attributable to smoking and exposure to tobacco smoke continue to increase and now approach $300 billion annually, with direct medical costs of at least $130 billion and productivity losses of more than $150 billion a year.

**D.      Defendants Initiated And Sustained The Cigarette Epidemic And Deliberately Misled The Public About The Risks Of Smoking Cigarettes.**

64.     Native Americans introduced Europeans to the use of tobacco following Columbus's arrival in the New World, and tobacco provided much of the economic base that allowed the United States to become an independent nation.  However, for most of its history,

tobacco was used in pipes, as cigars, or in oral or nasal forms.  The use of tobacco as cigarettes was largely a development of the 20th century.

65.     Cigarettes used a different blend of tobacco leaf which generated a more acidic smoke than that of pipes and cigars.  Nicotine is the principal constituent of tobacco smoke being sought by the smoker, and it can be easily absorbed across the oral mucosa from the alkaline smoke of pipes and cigars without inhalation into the lung.  However, the more acidic smoke of a cigarette must be inhaled into the larger absorptive surface of the lungs in order to absorb amounts of nicotine sufficient to satisfy the smoker's addiction.  It is this inhalation into the lung, with its concomitant deposition and absorption of the other toxic and carcinogenic compounds in the smoke, which resulted in the epidemic of cigarette-related diseases evident over the last century.

66.     Concern among members of the scientific community that cigarette smoking caused disease grew with the publication of several retrospective epidemiological studies of lung cancer by the early 1950s.  By the mid-1950s, publication of prospective mortality studies conducted in Britain and the United States, and the demonstration that tobacco tar could produce cancers when painted on the backs of mice, along with other lines of scientific evidence, resulted in a consensus among the scientific community that cigarette smoking could cause disease, including lung cancer.  Publication and widespread dissemination in the lay press of this scientific information defining the disease risks of smoking cigarettes occurred during the mid-1950s.  The initial public health response to this knowledge included a public information campaign and development of smoking cessation interventions for individuals, which resulted in a steep fall in U.S. per-capita consumption of cigarettes as the public became aware that cigarette smoking caused lung cancer.

67.    The tobacco industry's response was the creation of the Council for Tobacco Research, which was designed to give the appearance of scientific legitimacy to the tobacco industry's media campaign to confuse the public about the strength of the scientific evidence linking cigarette smoking and disease.

68.    In January 1954, for example, the Defendants issued a "Frank Statement to Cigarette Smokers," published in hundreds of newspapers across the United States, indicating that there was no proof linking cigarette smoking to disease, and also promising to keep the public informed about any relationship between smoking and disease.

69.    This message from Defendants was consistently made over the next half century, including the following statements by Philip Morris Vice President George Weissman in 1954:  "If we had any thought or knowledge that in any way we were selling a product harmful to consumers, we would stop business tomorrow."

70.    Beginning at about this same time, cigarette companies introduced and marketed filtered cigarettes and "low tar and nicotine" cigarettes as an effort to prevent smokers from quitting based on growing health concerns among smokers.  One result of these two actions was that the decline in smoking following demonstration of smoking-related lung cancer risks reversed; and subsequently, per-capita consumption of cigarettes rose to new heights.  A second response was a shift in the type of cigarette smoked.  Less than 3% of cigarettes sold were filtered in 1950, but over 50% were filtered by 1960, representing a dramatic response to the introduction and marketing of filtered cigarettes as products which could reduce health risks.

71.    A decline in per-capita consumption also followed the release of the first Surgeon General's report in 1964 and the widespread publication of the information it contained.  This

information was once again disputed by Defendants as the industry conducted an extensive public relations campaign to convince the public that there was still substantial scientific uncertainty as to whether cigarette smoking actually caused lung cancer.

72.     On June 2, 1967, the Federal Communication Commission ruled that significant amounts of free time be made available for anti-smoking commercials to balance the cigarette advertisements on television and radio.  As a result, during the period 1967-1970, a large number of anti-smoking television spots were broadcast free by the major television networks. Effectiveness of this anti-tobacco advertising is supported by changes in U.S. per-capita consumption and smoking cessation during the period of intense broadcast activity occurring between 1967 and 1970.  When cigarette advertising was banned from broadcast media after 1970, anti-smoking spots were also removed, per-capita consumption increased and cessation rates declined.  The tobacco industry conducted extensive lobbying, public relations, and media efforts to prevent the development of similar public health efforts at the national and state level and to hinder their effectiveness once they were implemented.

73.     Despite Defendants' knowledge in the 1950s that smoking caused disease, Defendants' concealed such knowledge and misrepresented what they knew about those dangers.

74.     Defendants consistently communicated the message that smoking does not cause disease throughout the 1950s, 1960s, 1970s, 1980s, and 1990s.

75.     For example, in 1997, Philip Morris CEO Geoffrey Bible, echoing statements made in 1954, testified under oath that he would shut down the companies' manufacturing plants "if scientists proved that cigarettes were a cause of cancer."

76.     The CEOs of the Defendant companies also testified under oath before Congress in 1994 that nicotine in cigarettes is not addictive.

77.     Cigarette manufacturers expected consumers such as Decedent to rely upon their advertising, including public statements about smoking and health.

78.     During the relevant period, Defendants spent hundreds of millions of dollars every year to expose the public to their advertising and public statements regarding smoking and health.

79.     So pervasive was the tobacco companies' cigarette marketing and public relations that the Federal Trade Commission (FTC) concluded in 1967 that virtually every American living during this time period was exposed to marketing themes communicated by these Defendants.

80.     An FTC Report in 1977 found that the American public was still "uninformed" about the true risks of smoking.

81.     During all relevant periods, Defendants intended for their customers to buy their cigarettes, smoke every cigarette in the pack, and buy another pack.

82.     During all relevant periods, Defendants would not blame a person for smoking two packs a day.

83.     During all relevant periods, Defendants would not fault a smoker for smoking one or two packs a day.

84.     During all relevant periods, Defendants would not fault a smoker for smoking three packs a day.

85.     Defendants intended that their customers would rely on their assurances regarding smoking and health, and continue to smoke cigarettes rather than attempt to quit.

86.     During all relevant periods, Defendants would not fault a smoker for not quitting smoking.

87.     During all relevant periods, Defendants would not fault a smoker for not attempting to quit smoking.

88.     During all relevant periods, Defendants would not fault a smoker for attempting, but failing, to quit successfully.

89.     During all relevant periods, Defendants did not offer their customers any advice on whether to, or how, quit smoking.

90.     Decedent smoked cigarettes as intended by Defendants.

**E.      Defendants Developed Filtered And Low Yield Cigarettes As Health "Reassurance" Products, Knowing that These Cigarettes Were No Safer than Regular Cigarettes.**

91.     The tobacco industry undertook approaches to modification of the cigarette in an effort to reassure the public that smoking filtered or "low tar" cigarettes was safe, or at least safer than unfiltered or high tar products.  The cigarette manufacturers recognized that they were marketing the "illusion" of filtration and risk reduction since they understood that smokers were smoking to obtain a desired dose of nicotine to satisfy their addiction and would not smoke cigarettes that would not meet that need.

92.     Reductions in tar and nicotine yields were undertaken at a time when the tobacco manufacturers recognized that smokers of filtered or low tar cigarettes would compensate by

smoking more intensely in a variety of ways to preserve their intake of nicotine, and so smokers of these cigarettes would not substantially reduce either their intake of tar or their disease risk. The principal mechanism by which the tar and nicotine yields of a cigarette are lowered is to place ventilation holes in the filter to dilute the smoke that is drawn in by the machine. This mechanism simply replaces some or most of the smoke in the machine puff with air entrained through the ventilation holes, thereby lowering the tar and nicotine yield in proportion to the amount of air entrained. The smoking machines, by protocol, do not alter their smoking pattern in response to this dilution of the smoke; but smokers are smoking to obtain nicotine (not air), and when the smoke is diluted, they simply increase their puff volume and frequency (or otherwise alter their smoking pattern) to return their nicotine intake to that needed to satisfy their addiction. This change in pattern of smoking is called compensation. The engineering changes producing ventilation holes in cigarette filters take advantage of these known compensatory changes among smokers such that so called "low tar" cigarettes yield very low levels of tar and nicotine when smoked by machine, but much higher levels of tar and nicotine when smoked by smokers. The actions of the tobacco companies in developing cigarettes that could be marketed as lower risk products are well documented by internal industry documents. Those documents demonstrate that the companies not only knew that low tar cigarettes did not deliver lower smoke exposure to the smoker, but also that these cigarettes were designed so that they would preserve the smoker's exposure to nicotine.

93.     In undertaking efforts to alter cigarettes so that they could be offered as health reassurance products, the research scientists at the major cigarette manufacturers often collaborated together, shared information, and conducted joint activity. This ensured that all of the companies were aware of the changes in cigarette design and their consequences. For example, on

May 24, 1968, the research directors for the major tobacco companies, including Helmut Wakeham from Philip Morris, met to plan a joint approach to examining the relationship of machine-measured tar values to human exposure and laid out the pieces of a joint project to be conducted in the laboratories of the individual companies.  The minutes state:

> . . . the various companies represented at the meeting agreed to carry out within their own laboratories parts of Phase I. The aim of these experiments will be to check the nature of the FTC-Tar vs Filter nicotine curve . . .

> It was agreed by the Research Directors present to present this new program to the remaining two companies.

94.     One of the earliest modifications of the cigarette to be marketed in order to reassure smokers about the disease risks of smoking was the addition of a filter to the tobacco rod of the cigarette.  However, industry scientists understood that smokers were smoking to obtain nicotine and that they would change their smoking behavior to preserve their intake of nicotine, thereby eliminating any beneficial effect of filters.  In a March 24, 1961 internal Philip Morris memorandum from Helmut Wakeham to Hugh Cullman, Dr. Wakeham wrote:

> As we know, all too often the smoker who switches to a hi-fi cigarette winds up smoking more units in order to provide himself with the delivery which he had before. In short, I don't believe the smoking pattern has changed much, even with cancer scares and filter cigarettes.

95.     This observation by Philip Morris' Dr. Wakeham is supported by a wealth of other documents demonstrating that the tobacco companies knew that smokers were smoking to derive a fixed amount of nicotine and would change their smoking behaviors (*i.e.,* compensate) to preserve that intake of nicotine when cigarettes were modified to deliver a lower dose of nicotine with machine smoking.

96.     A March 1973 Philip Morris USA Research Center report titled "Smoking Behavior: Real World Observations" by Dunn, Schori, and Duggins concluded the following:

> We find that our smokers were smoking cigarettes in 1972 that delivered significantly less tar and nicotine than in 1968. At the same time they were smoking more cigarettes as well as more of the rod from each cigarette. These findings suggest, and provide real world confirmations of findings from other investigators in laboratory situations (Schori, 1971), that a tar and/or nicotine quota mechanism may be operative. That is, they may be smoking more (more cigarettes and more rod) to compensate for the decreases in tar and nicotine delivery of their cigarettes.

97.     Philip Morris's Dr. Helmut Wakeham delivered a presentation titled "Smoker Psychology Research" to the company Board of Directors on November 26, 1969.  In the written report of the presentation, Wakeham addressed compensation, and the company's ability to monitor smoke intake, in the following terms:

> I have already referred to differences in the daily consumption of cigarettes by smokers. Here in this distribution you will see that the range is one cigarette to more than sixty per person per day. But numbers of cigarettes do not tell the whole story. We know that smokers also vary in
>
> numbers of puffs per cigarette
>
> volume of smoke per puff,
>
> length of cigarette smoked, and so on and on
>
> Because of these variations we have sought a more meaningful index of smoker intake and have come up with a mean daily intake of smoke. This measure is obtained by analyzing the nicotine in the filter when the smoker has finished. . . ."
>
> This great variability among smokers results from the fact that a smoker tends to seek his own level of intake.

Dr. Wakeham concludes that: "A smoker's intake level is determined by the smoker himself, not by the manufacturer of the cigarettes."

98.     In a February 11, 1971 internal Philip Morris memorandum from W.L. Dunn to Dr. Wakeham, Dunn wrote that: "The SEX-I findings are strongly supporting of the position that the individual is more determinative of his intake level than is the cigarette he smokes."

99.     R.J. Reynolds scientist Claude Teague, in a report dated March 28, 1972 and titled "Research Planning Memorandum on a New Type of Cigarette Delivering a Satisfying Amount of Nicotine with a Reduced 'Tar'-to-Nicotine Ratio," wrote:

> In theory, and probably in fact, a given smoker on a given day has a rather fixed per hour and per day requirement for nicotine. Given a cigarette that delivers less nicotine than he desires, the smoker will subconsciously adjust his puff volume and frequency, and smoking frequency, so as to obtain his per hour and per day requirement for nicotine (or, more likely, will change to a brand delivering his desired per cigarette level of nicotine).

100.    Philip Morris researchers T.R. Schori and William Dunn authored an internal study titled "Tar, Nicotine, and Cigarette Consumption" in January 1972.  In the report, the authors wrote that their study demonstrated compensation to obtain nicotine:

> "Cigarette consumption rate, i.e., number of cigarettes smoked per day, was found to vary as a function of the nicotine delivery of these cigarettes. Specifically, as nicotine increased, cigarette consumption rate decreased. This finding supports the notion that smokers develop a daily nicotine intake quota . . . ."

101.    A "Private and Confidential" British American Tobacco (BAT) report titled "Notes on the Group Research & Development Conference at Duck Key, Florida" summarized BAT Group members' discussions at a January 1974 conference including the following item: "The Kippa study in Germany suggests that whatever the characteristics of cigarettes as determined by smoking machines, the smoker adjusts his pattern to deliver his own nicotine requirements."

102.    This recognition that the smoker's pattern of smoking was the critical determinant of the resultant exposure was previously recognized in a joint meeting of the cigarette manufacturers research directors attended by Helmut Wakeham of Philip Morris on May 24, 1964, which listed as one of the conclusions:

> The results should emphasize that the principal determinate of exposure is the individual smoker's smoking behavior pattern.

103.    This knowledge that smokers would attempt to preserve their nicotine intake led to careful examination of the methods by which smokers would achieve compensation.  In an internal study on compensation dated November 3, 1971, BATCo researchers Creighton and McGillivray reported that smokers who were provided lower delivery cigarettes compensated to obtain higher deliveries of nicotine.  The authors acknowledged in their study that: "Publication of 'tar' and nicotine deliveries has led consumers to assume that switching to a lower delivery brand will of necessity reduce their intake of smoke.  It becomes important to know whether this assumption is true."  In evaluating this assumption, the authors found that the evidence suggested otherwise: "It was found that there is indeed a degree of compensation for reduced delivery.  The panel as a whole took larger puffs from the lower delivery cigarette, inhaled the smoke more deeply and held the smoke in the lungs for a longer time."

104.    A similar synthesis was prepared by Philip Morris's William Dunn for Clifford Goldsmith in a presentation dated May 8, 1974, titled "Dosage Controls."  In his presentation, Dunn addressed many aspects of nicotine, its role in smoking, and future research.  One area of study was smoker compensation.  Dunn wrote:

> We are now in the process of putting together a much more comprehensive account. Some recent studies of puffing patterns and some preliminary observations of inhaling patterns are suggesting

that the smoker is going to get the amount of tar he wants regardless of how many he smokes and regardless of the tar delivery of his cigarette...

I will then tell you of a study about to get underway in which we will be looking more carefully at how the smoker changes his inhalation patterns in order to regulate intake.

But in order that you can more fully appreciate the implications of these investigations, I'd like to first put our efforts into conceptual context. I am sure you are aware of our belief people smoke for rewards they get at a pharmacological level. Despite the fact that we don't understand the physiological mechanism and despite the fact that we can't identify the psychological and subjective experience that the smoker seeks, we continue to hold to this belief. It is simply not an adequate explanation to say that smoking is a habit or that it is a social behavior. A smoker is introducing something into his system that he wants. Certain components of the smoke, most likely nicotine, act upon his system in some undetermined way as to give him some undetermined pleasure.

If this is true, then we would expect the smoker to seek to take in that amount of smoke that does the job best for him. He is going to regulate his nicotine intake to suit his need...

We are hypothesizing that the smoker regulates his smoke intake to suit his dosage needs. He'll take in more if the smoke is low in tar, less if the smoke is high in tar. . . Our program, then, is aimed at identifying the various means by which a smoker can adjust his intake, and determining to what extent he uses these various means.

There are practical implications. If the smoker does have the latitude for regulating smoke intake we are beginning to suspect he has, then the amount of tar the manufacturer gives him is far less crucial then we've all been assuming. It may well be that the Marlboro smoker today gets as much from his cigarette as the Philip Morris non-filter smoker got 20 years ago, by puffing and inhaling more efficiently so that a greater proportion of that made available to him is gotten over to his system.

105.    In an internal Philip Morris memorandum to Paul D. Smith, C.H. Goldsmith, and others, dated August 11, 1967, Dr. Wakeham detailed in-house tests comparing smoke yields of cigarettes smoked by machines versus cigarettes smoked by smokers which demonstrated that Philip Morris was aware that compensation would lead to a circumstance where the smoker would

receive the same dose of smoke when switching to a purportedly lower delivery cigarette. Dr.

Wakeham found that human smokers of low yield cigarettes differed from the smoking machine

by "adjust[ing] to the diluted smoke by taking a larger puff so that he still gets about the same

amount of equivalent undiluted smoke."  Wakeham concluded that:

> The smoker is, thus, apparently defeating the purpose of dilution to
> give him less "smoke" per puff. He is certainly not performing like
> the standard smoking machine; and to this extent the smoking
> machine data appear to be erroneous and misleading. It has probably
> always been so for diluted smoke cigarettes, whether dilution is
> obtained by porous paper or holes in the filter.

106.    The predominant method by which the tobacco companies produced lower tar

cigarettes was through the use of holes in the filter that allowed air to be mixed in with the smoke

drawn in by the smoking machine, thereby diluting the concentration of smoke contained in the

fixed volume of the machine puff.  They recognized from the onset of the use of this dilution

approach that, while the machine puffing patterns would remain fixed, smokers would compensate

for the reduced delivery by changing the way they puffed on the cigarette and some would also

block the holes increasing the amount of smoke delivered to the smoker.  The filter holes were

located where Philip Morris knew that smokers' lips could block the holes but where the machine

would not.  In a July 28, 1967 memo from W.L. Dunn to RB Seligman, it was noted:

> An earlier study (Memo of June 27, 1967) established that lip
> contact with the tipping paper extended to 9.96 mm from the outer
> end of the tipping paper for the average smoker. Since the air
> dilution holes are located in a band from 8.0 to 9.7 mm, it follows
> that some of these holes are likely to be occluded under normal
> smoking conditions, whereas no occlusion is likely to occur when
> the cigarettes are machine smoked for analysis.

107.    The memo goes on to note that the smokers derived the same amount of smoke from cigarettes with the holes open and blocked, suggesting that they may have fully compensated for the dilution due to filter ventilation.

108.    In an August 10, 1967 "Confidential" internal Philip Morris memorandum titled "A Study of the Effect of Air Hole Blockage on Gross Puff Volume in Air Diluted Cigarettes," JoAnn Martin and Dunn wrote to Dr. Wakeham and Seligman that smokers took larger puff volumes when smoking cigarettes with ventilation holes in the filter, preserving the mainstream smoke puff volume (a measure of the volume drawn through the cigarette and of smoke exposure).  They concluded:  "We submit these results as further evidence that smokers adjust puff intake in order to maintain constant smoke intake."  This study also evaluated the effect of occluding the ventilation holes on puff volume and smoke intake, and demonstrates a very early understanding that placing ventilation holes in the filter would reduce machine measured tar values but the smoker would change their puffing behavior to preserve their smoke intake.

109.    These observations are confirmed by a research report from Philip Morris Europe, dated June 1974, reporting on an internal study titled "Human Smoking Habits."  The writers state:

> There is evidence in the literature that the nicotine of cigarette smoke exerts a distinct pharmacological effect on the smoker (1) which re-enforces the smoking behaviour. The smoker doses himself with nicotine according to his personal needs which depend on the level of arousal (2), external stress (3), his personality (4) and, possibly, a number of other factors.
>
> A controlled experiment with a group of some 150 smokers who were given at random high and low nicotine delivery cigarettes (0.8 mg/cig. and 1.6 mg/cig.) showed the existence of a definite compensation mechanism in the smoker which operates on a per cigarette base (preferred delivery fairly independent of standard delivery) and not on a "cigarette smoked per day basis" (5).

> Being involved in new product research and being confronted with the fact of the public's awareness of league tables for nicotine and tar deliveries, the problem became acute to check objectively if standard analytical smoke yields have anything to do with the preferred smoke yield of the smoker. The experiments which are reported have shown that the answer is an absolute NO.
>
> . . . The conclusion is quite obvious: analytical smoke yields cannot be used to estimate the smoke up-take by the smoker, and, analytical smoking conditions are not indicative of the smoking parameters used by the human smoker. Each brand of cigarettes is likely to be smoked under a set of conditions which depends as much of its self-selected consumer segment as of its product characteristics. New products should, therefore, be checked-out how they are smoked by those who chose to buy them and, presumably, like them.

110.    An undated Philip Morris research paper/proposal titled "How Much Smoke Does the Smoker Get?" concludes with the following:

> 1.    The smoker will get what he wants regardless of what the cigarette delivers.
>
> 2.    …….
>
> 3.    There is a limit to how far we can go in lowering tar content in the smoke. Up to a point he'll tolerate reductions in delivery because he can regulate by changing his puffing and inhaling patterns, but if it gets so low that even by these methods he can't get his dose, he won't smoke it.

111.    This document demonstrates that Philip Morris understood that changes in cigarettes which led to actual reductions in tar and nicotine delivery to smokers would also lead smokers to abandon those cigarettes.  This recognition set the stage for development of cigarettes that had very low machine yields but which had sufficient "elasticity of delivery" to allow the smokers smoking them to receive a fully sufficient delivery of nicotine.

112.    Similarly, a 1972 internal document confirmed that "[w]ithout nicotine…there would be no smoking."

113.    A 1972 confidential R.J. Reynolds memorandum stated that nicotine is "a potent drug with a variety of physiological effects…"  The memo continued:

> We have deliberately played down the role of nicotine, hence the non-smoker has little or no knowledge of what satisfaction it may offer him, and no desire to try it.  Instead, we somehow must convince him with wholly irrational reasons that he should try smoking, in the hope that he will for himself discover the real 'satisfactions' obtainable. ... [I]f we meekly accept the allegations of our critics and move toward reduction of elimination of nicotine from our products, then we shall eventually liquidate our business. If we intend to remain in business and our business is the manufacture and sale of dosage forms of nicotine, then at some point we must make a stand.

114.    The tobacco companies recognized that cigarettes needed to deliver a sufficient dose of nicotine in order to satisfy the smoker, and not delivering that dose would result in cigarettes that smokers would not use.  However, they also understood that the smoker would change their smoking behavior in predictable ways to compensate for changes in cigarette design, largely filter ventilation holes, which reduced machine yield.  Using this understanding of cigarette design and smoker response, the companies designed and developed cigarettes that could be marketed based on low machine measurements in order to reassure smokers that they were reducing their exposure while actually providing a full dose of smoke when used as the companies knew they would be used.

115.    The alternatives in attempting to develop a cigarette that could be marketed as reducing risk are clearly articulated by S.J. Green in his minutes of a September 1968 British-American Tobacco Research Conference held at Hilton Head, South Carolina.

116.    Later in the conference report, Green recorded that BAT's R.A. Sanford commented on Green's categorization of cigarette products, recommending that the "health

image" of cigarettes be clarified to expressly include "low tar — low nicotine cigarettes which the public accepts as a healthier cigarette," and that the "health-oriented" product be expressly defined as one which produced a "near zero reading in a mouse skin painting test."  BAT clearly understood the difference between the changes in cigarette design that would create reassurance and those that might actually reduce risk.  BAT scientist S.J. Green distinguished between cigarettes that only "reassured" smokers as to the health benefit of a brand from those cigarettes that demonstrated an actual reduction in "biological activity."

117.    This same recognition of the difference between real risk reduction and the illusion offered by filters and lower tar was recognized by Philip Morris.  In a confidential special report titled "Market Potential of a Health Cigarette" dated June 1966, ME Johnston of Philip Morris describes the characteristics of a cigarette that could be marketed as a health reassurance product as follows:

> I have assumed that any health cigarette must compromise between health implications on the one hand and flavor and nicotine on the other. It seems clear from the performance of existing health cigarette entries that flavor and nicotine are both necessary to sell a cigarette. A cigarette that does not deliver nicotine cannot satisfy the habituated smoker and cannot lead to habituation, and would therefore almost certainly fail. Health claims alone without flavor or nicotine cannot sell cigarettes--most smokers would rather quit than switch.

118.    Earlier in the same report, the importance of marketing to health concerned smokers is made clear in a series of points which include:

> "10. The illusion of filtration is as important as the fact of filtration."

119.     That Philip Morris recognized that filters were key to the deception and
misinformation it was presenting relative to its "health reassurance" cigarettes is made clear in the
same report.

> In the absence of legislation or a resumption of the tar derby,
> LongPar would probably be the best entry, since it is without
> question a radically different method of filtration and can be made
> to give the illusion of filtration without impairing, the tobacco
> flavor.

120.     This concept was translated into cigarette design, as demonstrated by a September
21, 1977 memorandum to P.L. Short titled "Compensation."  BATCo's F. Haslam reported that he
and fellow employees Jeremy Wood and Ian Ayres "agreed that it should now be possible to
design a number of cigarettes which would have the same smoking machine delivery but different
deliveries to the compensating smoker."

121.     With respect to cigarette design, Colin Greig from BATCo wrote that:  "Given the
design parameters of the cigarettes, it is possible to speculate that human compensation has, for a
significant part of the smoking population, negated attempts to reduce tar deliveries."  He then
proposed the need for a "compensable" cigarette that could be smoked more intensely to obtain
more nicotine when needed.  Greig specifically proposed a product that offered "elasticity of
delivery" achieved through "non-obvious cigarette design features":  "What would seem very
much more sensible, is to produce a cigarette which can be smoked at a certain tar band, but which,
in human hands, can exceed this tar banding."

122.     Clearly, a tobacco industry goal was to develop products that could be promoted as
delivering lower yields but, when smoked, would deliver a full dose of nicotine in order to satisfy
the smoker.

123.    BATCo researcher D.E. Creighton wrote an undated document titled "Structured Creativity Group Presentation," in which he evaluated the then-current state of the cigarette industry and its products.  Creighton acknowledges that, "Most studies of smokers indicate that a large number will compensate for reduced delivery by increasing the amount of smoke taken from a cigarette with lower delivery."  With respect to cigarette design, he writes:  "Cigarettes with compensable filters will be developed.  Such products will have low delivery when smoked under standard conditions, but, being velocity sensitive, a smoker may readily take higher delivery than the standard delivery, if he so wishes."  This document demonstrates an understanding that the low tar cigarette designs will have deliveries that increase dramatically when the "velocity" of the puff (puff draw rate) increases, allowing smokers to derive whatever amount of nicotine he or she desires from these "elastic" cigarettes.

124.    The result of this thinking, as implemented at Philip Morris, was brands of cigarettes that were marketed to the smoker as delivering less smoke while, in actuality, they delivered the same amount of smoke (and risk) as higher tar cigarettes.  Philip Morris's awareness of this deception to the smoker by the use of machine measured tar values and use of the term "light" is demonstrated in an internal report dated September 17, 1975 from Barbro Goodman to Leo Meyer.  Goodman reported on "smoker profile data" obtained using a device called a "Smoker Simulator."  Goodman's study compared data of Marlboro 85 smokers to data for the same smokers when switched to the lower yield product Marlboro Lights.  Goodman concluded that: "In effect, the Marlboro 85 smokers in this study did not achieve any reduction in smoke intake by smoking a cigarette (Marlboro Lights) normally considered lower in delivery."

125.    Barbro Goodman also examined "the question of what might happen to deliveries to the smoker when he partially covers the dilution holes" in an October 21, 1982 study. Goodman

concluded that:  "The decrease in dilution from covering a portion of the perforated area can result in an increased delivery to the smoker of highly diluted cigarettes even though the puff parameters decrease."

126.    The tobacco companies recognized that the smoking public was being misled by the tar values and by the use of terms such as "low tar" and "light."

127.    A report authored by "DJW" (D.J. Wood) dated January 19, 1977 concluded the following based on a comparison of two types of cigarettes:

> The subjects smoked these two brands with greater intensity than they smoked cigarettes of more normal delivery, taking larger puffs at more frequent intervals. From each brand, the subjects on average took more than twice volume of smoke than was taken by a standard smoking machine. This emphasizes the misleading nature of published smoke deliveries when dealing with cigarettes of this type.

128.    The minutes of a July 21, 1972 BAT Scientific Developments Committee meeting included the following:  "Dr. Green reported that we were now becoming increasingly capable of manipulating cigarette design to take commercial advantage of league table positions, e.g. it has been shown in a limited study that smokers compensate by taking bigger puffs in filter ventilated cigarettes. In the short term, it could be argued that the social purpose of the league tables could be defeated."

129.    A clear understanding that the products the industry was offering as reduced exposure and reduced risk cigarettes to the smoking public were neither, and that what the industry was doing was in conflict with the understanding of public health authorities, is demonstrated in a 1978 BATCo document.  BATCo scientist David Creighton reviewed internal and external

evidence of nicotine compensation among smokers of low yield products.  Near the close of his

paper Creighton wrote:

> It is difficult to ignore the advice of the Health Authorities who
> advise smokers to give up smoking or change to a lower delivery
> brand but there is now sufficient evidence to challenge the advice to
> change to a lower delivery brand, at least in the short term. In
> general a majority of habitual smokers compensate for changed
> delivery, if they change to a lower delivery brand than their usual
> brand. If they choose a lower delivery brand which has a higher tar
> to nicotine ratio than their usual brand (which is often the case with
> unventilated lower delivery products) the smokers will in fact
> increase the amounts of tar and gas phase that they take in, in order
> to take in the same amount of nicotine.

130.    An August 11, 1967 Philip Morris memo titled "Plastic Dilution Tipped

Parliament" makes it clear that Philip Morris recognized that the use of ventilated filters would

mislead the smoker into believing that they would receive less tar:

> Two tests conducted at Product Opinion Laboratories demonstrate
> that in smoking a dilution filter cigarette [sic], the smoker adjusts
> his puff to receive about the same amount of "undiluted" smoke in
> each case. . . . In the smoking machine the puff volume is constant
> so that with dilution the quantity of "equivalent undiluted smoke"
> delivered to the Cambridge filter is reduced. Not so with the human
> smoker who appears to adjust to the diluted smoke by taking a larger
> puff so that he still gets about the same amount of equivalent
> undiluted smoke. . . . The smoker is, thus, apparently defeating the
> purpose of dilution to give him less "smoke" per puff. He is
> certainly not performing like the standard smoking machine; and to
> this extent the smoking machine data appear to be erroneous and
> misleading. It has probably always been so for diluted smoke
> cigarettes, whether dilution is obtained by porous paper or holes in
> the filter.

131.    This clear understanding that they were deceiving both the smokers and the public

health authorities is further demonstrated by Brown & Williamson general counsel Ernest Pepples

in an internal memorandum dated February 4, 1976 describing the behavior of all of the tobacco

companies and titled "Industry Response to Cigarette/Health Controversy."  In this memorandum, Pepples wrote:

> The new brands vying for a piece of the growing filter market made extraordinary claims. There was an urgent effort to highlight and differentiate one brand from the others already on the market. It was important to have the most filter traps. Some claimed to possess the least tars. In most cases, however, the smoker of a filter cigarette was getting as much or more nicotine and tar as he would have gotten from a regular cigarette. He had abandoned the regular cigarette, however, on the ground of reduced risk to health.

132.    In addition to recognizing that low machine measured yield cigarettes would deliver a full dose of tar and nicotine to the smokers who used them, internal tobacco industry testing revealed that the tar generated by cigarettes with the design features that make them low tar in machine testing (ventilated filters) are actually more biologically active (toxic) in the same in vitro testing that Philip Morris claims to use to monitor the toxicity of changes in its products. Nevertheless, the cigarette manufacturers have not directly communicated that information to consumers or eliminated the hazardous design changes.

133.    Even with their understanding that low tar cigarettes were misleading smokers and did not deliver on the promise of lower tar and risk, the cigarette manufacturers continued to market these products with messages intended to allay the health concerns of smokers.  In the 1976 Federal Trade Commission report to Congress, the Commission noted that the advertising theme of relieving anxieties about the risks to health posed by cigarette smoking was one of the three dominant themes in cigarette advertising, as it had been for some time.

134.    The documents identified (1) establish that the cigarette companies were aware of nicotine compensation and design changes that could be employed to facilitate compensation by smokers; (2) show that the companies were aware that the FTC-machine measured yield was

misleading to consumers in that it gave little to no measure of how much tar and nicotine, whether in absolute terms or when comparing different brands, were ingested into the smoker's body; and (3) lead public health authorities to the erroneous conclusion contained in the 1981 Surgeon General's Report that switching from high machine yield to low yield products conferred a lung cancer benefit.  Public health authorities would not have reached that conclusion had they had access to the internal tobacco industry documents and studies, or the information contained in those documents, at the time of the Report.

135.    In the preface of that Report, the Surgeon General stated:

> Overall, our judgment is unchanged from that of 1966 and 1979: smokers who are unwilling or as yet unable to quit are well advised to switch to cigarettes yielding less "tar" and nicotine, provided they do not increase their smoking or change their smoking in other ways.

136.    Had the information available to the tobacco industry and described above been available to the scientists preparing the 1981 Surgeon General's Report, that Report would not have drawn the erroneous conclusion that lower tar cigarettes produced lower risk or have made the recommendation that smokers who could not quit were "well advised to switch to cigarettes yielding less 'tar' and 'nicotine.'"

137.    The cigarette companies purposefully failed to disclose to public health authorities the internal industry understanding of the deceptive nature of low tar cigarettes and the influence of compensatory behavior on exposure of smokers who used these cigarettes.  The cigarette companies' intentional misleading to public health authorities was based on the understanding that the companies were benefiting from the lack of knowledge among smokers and by the public health authorities.

138.    The deliberate withholding of scientific information based on corporate interests is demonstrated by R.J. Reynolds' A.H. Laurene, who made handwritten notes about an internal "Puff Profile Paper" that had been proposed for publication.  Laurene observed that the results of work suggest:  "Our [RJR's] own approach—higher filtration and/or air dilution—is made to seem self-defeating by these data."  Laurene concludes:

>    1.    This paper is well-organized, professionally written, and describes highly competent work. There is nothing wrong with this paper as concerns work quality, scientific merit, or written preparation.

>    2.    At this time, contents can be interpreted to be contrary to Corporation interests...

>    3.    Because publication of this paper might raise further controversy on the issue of "tar" delivery to smokers, publication is deferred.

139.    The harm to "corporate" interests of concern to the tobacco industry was a decline in sales that would occur if smokers concerned about their health quit smoking.  The "reassurance" products (filtered and lower tar cigarettes) offered by the tobacco companies were largely marketed to those smokers who were concerned about the risks of smoking rather than to those who were not interested in quitting.  The goal of these products was to "intercept" smokers on the way to cessation, and thereby preserve sales, as demonstrated by a Brown & Williamson chronology of smoking and health research.  That chronology lists for the year 1978:

>    Litzinger of Brown & Williamson proposes research on how people stop smoking so that Brown &Williamson can design products to "intercept" people who are trying to quit. (650510607.)

140.    This goal remains in effect even though each manufacturer acknowledges the public health consensus by referring those who visit their website to the Surgeon General's Report or to the rescission of the FDA guidance on tar values, which describes them as misleading.  Even

with this public acceptance of the absence of a risk reduction with the use of low tar cigarettes, cigarette manufacturers continued to market brands of cigarettes as "light" and "ultra light." This marketing continued through much of the last decade. The terms "light" and "ultra light" were only removed from the market after the use of terms such as "light" and "low tar" was banned by recent legislation giving the FDA regulatory authority over tobacco products.

141. Even following the congressionally mandated removal of misleading terms such as "light" and "low tar," the tobacco manufacturers have persisted in their effort to mislead consumers to believe that different brands offer less risk. While this prohibition on the use of misleading terms is new in the United States, some 40 other countries have previously adopted bans on such misleading terms. In those countries, tobacco manufacturers have shifted to using colors to differentiate brands by their tar rating in order to preserve the investment they have made through brand marketing in convincing smokers that lower tar means less risk and is an alternative to quitting. Full flavor brands are darker colors with lighter colors and white packaging signifying lower tar brands. Research shows that smokers perceive lighter colors as signifying less risk. In the United States, as part of their interception of smokers on the way to cessation and in anticipation of the ban on misleading descriptors such as "light," cigarette manufacturers have increasingly linked the tar values and descriptors of their brands to colors in the packaging in order to preserve the accumulated understanding in smokers that these brands were safer and alternatives to cessation. This effort has accelerated with the passage of legislation giving the FDA jurisdiction over tobacco products and banning misleading descriptors.

142. Regarding Philip Morris brands, for example, Marlboro lights are converted to Marlboro gold (in a largely white package) and ultra lights to silver. The color silver has been

tested in at least one research study and found to mislead smokers to believe that "silver" branded cigarettes were lower in risk.  That study found:

> Respondents were significantly more likely to rate packages with the terms 'light', 'mild', 'smooth' and 'silver' as having a smoother taste, delivering less tar and lower health risk compared with 'regular' and 'full flavor' brands. Respondents also rated packages with lighter colors and a picture of a filter as significantly more likely to taste smooth, deliver less tar and lower risk. Smokers were significantly more likely than non-smokers to perceive brands as having a lower health risk, while smokers of light and mild cigarettes were significantly more likely than other smokers to perceive brands as smoother and reducing risk. Perceptions of taste were significantly associated with perceptions of tar level and risk.

143.    This effort at persistent deception is occurring over widespread objection and concern from public health authorities that the shift is a deliberate effort to maintain the pattern of deception begun with filtered and low tar cigarettes by simply shifting the deception to the use of colors instead of words.  In response to this concern, the New York City Department of Health has begun a media campaign in an effort to prevent smokers from being deceived by the transition to colors.  The June 14, 2010 press release for that media campaign stated:

> The Health Department today launched a new educational campaign to alert consumers to a deceptive marketing technique the tobacco industry is using to evade the federal ban on package labels such as "light," "low-tar" and "mild."
>
> The Family Smoking Prevention and Tobacco Control Act, signed into law in June 2009, bans the use of such terms in packaging or advertising because they falsely imply that some cigarettes are less hazardous than others. Cigarette makers have removed those labels, but some have replaced them with color schemes clearly intended to convey the same message. Under the new color scheme, regular cigarettes will come in red packages, light cigarettes in gold, mild in blue, ultra lights in silver, and menthols in green.

144.    These behaviors demonstrate the persistent cigarette industry behavior of misleading the public whenever it favors their marketing efforts.

**F.      Defendants' Misleading "Reassurance" Products Have Sustained the Cigarette Epidemic and Have Devastating Implications for the Public Health.**

145.     It is now generally recognized by the scientific community that so called "low yield" products have not reduced disease risk, but a description of the evolution of scientific knowledge of "low yield" cigarettes and their disease risks is important to an understanding of the deception of the public by these products.

146.     The increase in lung cancer risk with increasing smoke exposure, and the demonstration that most of the carcinogenicity of tobacco smoke was in the particulate phase of the smoke, led to a suggestion by several leading public health experts that cigarettes which delivered less tar to smokers might also deliver less risk.

147.     In the 1950s and early 1960s, cigarette companies marketed a wide variety of brands using different testing protocols as the "lowest" tar brand and implied that these brands would be healthier.  In response to the misleading nature of these claims, the FTC banned the use of tar and nicotine claims in marketing.

148.     In 1966, as a response to public health recommendations that lower tar cigarettes might reduce disease risks and in order to reduce the confusion produced by competing claims by cigarette manufacturers about the tar deliveries of their cigarettes, the U.S. Federal Trade Commission promulgated standards for measurement of tar and nicotine using a standard machine smoking protocol and rescinded its ban on use of tar and nicotine yields in cigarette marketing. The FTC machine smoking protocol consisted of taking 35 ml puffs drawn over two seconds each minute until a specified length was reached.  This protocol does not reflect actual smoking patterns and tests all cigarettes with the same puff profile, even though it is recognized that smokers smoke cigarettes with different designs differently.  Neither the FTC nor the public health community

expected that the machine measured values using the FTC protocol would be accurate estimates of the smoke exposure of individual smokers smoking individual cigarettes because of the well-recognized variability among smokers in how they smoked individual cigarettes.  What measurements under the FTC protocol were expected to do was to identify cigarettes which, if smokers switched to them, would deliver less tar and nicotine to the smokers who smoked them. The expectation was that smokers who switched from a high tar brand to cigarettes with a low tar measurement would actually be exposed to less tar when they smoked, and that that lower tar exposure would result in less risk.

149.    Epidemiological studies from the late 1960s onward suggested that populations of smokers who chose to smoke lower tar or filtered cigarettes had lower lung cancer risks, but not lower risks of other diseases caused by smoking.  These findings were particularly exciting at that time since smokers had been smoking these reduced-yield cigarettes for only short periods of time; and, as more individuals used these products for longer periods of time, the reduction in disease risk would be expected to increase and national lung cancer death rates would fall.

150.    The recommendations by public health authorities to produce low-tar cigarettes failed to appreciate two important realities. First, smokers were powerfully addicted to the nicotine in cigarettes.  They actively changed the way they smoked individual cigarettes—and some smokers increased the number of cigarettes they smoked per day—in order to preserve their moment-to-moment and daily intake of nicotine.  Because cigarettes deliver smoke with a relatively fixed ratio of tar to nicotine, smokers also preserved their dose of tar when they preserved their dose of nicotine.

151.    Second, public health authorities dramatically underestimated the ability of cigarette manufacturers to engineer cigarettes that would yield very low tar and nicotine values when machine smoked, but yielded much higher levels of tar and nicotine when smoked by the smoker. Cigarettes were designed with an elasticity of delivery that allowed smokers to get much higher yields of tar and nicotine by altering their pattern of puffing.  Smokers may also obtain higher yields of tar and nicotine by blocking ventilation holes in the filters with their fingers or lips.  Low-yield cigarettes were designed in such a way that the same alterations in puff profile (e.g., larger, faster puffs) that resulted from a smoker's effort to compensate for a reduced nicotine delivery also generated much higher deliveries of tar and nicotine from the cigarette.  In addition, the ventilation holes in cigarette filters were placed in locations where they could easily be blocked by smokers' lips or fingers.  The combination of these two phenomena—compensation on the part of the smoker and elasticity of delivery in the cigarette—meant that most, perhaps nearly all, smokers who switched to these low-yield brands did not substantially alter their exposure to tar and nicotine and, correspondingly, did not lower their risk.

152.    The tobacco industry's own documents show that the industry used tar and nicotine yields produced by the FTC method to "reassure" smokers and to provide an alternative to quitting.

153.    Recently-disclosed documents make it clear that the interests of tobacco companies in keeping their customers hooked on nicotine led to extensive efforts to design cigarettes which would facilitate compensation by the smoker when smoking in a manner in which the companies knew he or she would smoke.  The unfortunate outcome of this process was not just the marketing by the tobacco companies of cigarettes with no real difference in disease risks as "lights" or "safer" products, but was also the lost opportunity to develop cigarettes that actually reduce biological

toxicity rather than simply falsely reassure smokers concerned about the risk of smoking.  An even more unfortunate outcome was that some smokers who were concerned about the risks of smoking responded by switching to these products instead of quitting, a change in smoking behavior that would actually have reduced the risk.

154.    Marketing of light cigarettes as delivering less tar, and by implication less risk, has resulted in many smokers who switched from higher yield cigarettes reporting that they did so in an attempt to reduce disease risk.

155.    Many smokers switch to lower yield cigarettes as part of an effort to quit or substantially reduce their smoking, but existing evidence suggests that they are not more likely to quit successfully than those who do not switch.

156.    Smokers who delay cessation by switching to lights face an increasing disease risk instead of the decreased disease risk that would have occurred through cessation.

157.    During the relevant period, many smokers switched to low tar and light cigarettes rather than quitting, because they thought low tar and light cigarettes were less harmful.

158.    During the relevant period, Defendants would not blame a smoker for switching to filter, low tar, and light cigarettes, rather than quitting.

159.    During the relevant period, Defendants intended that smokers would rely on their reassurance messages and switch to filters, low tar or light cigarettes, rather than quit smoking their cigarettes.

160.    Current public health recommendations do not include the recommendation that smokers switch cigarette brands based on FTC machine-measured tar and nicotine yields as a means of reducing future disease risks.  Current scientific consensus finds that smoking has not become less hazardous since the advent of "light" cigarettes, and may have become more hazardous.  The FTC, in 2008, recognizing the current public health consensus on the absence of a benefit for low tar cigarettes, has rescinded its guidance on tar and nicotine yields stating:

> Today, however, the scientific consensus is that machine-based measurements of tar and nicotine yields based on the Cambridge Filter Method do not provide meaningful information on the amounts of tar and nicotine smokers receive from cigarettes, and that the test method is sufficiently flawed to make statements of tar and nicotine yields as measured by the method unlikely to help consumers make informed decisions. Thus, the underlying premise of the 1966 guidance is no longer valid.

> In addition, the Commission believes the statements of tar and nicotine yields as measured by this test method are confusing at best, and are likely to mislead consumers who believe they will get proportionately less tar and nicotine from lower-rated cigarettes than from higher-rated brands. The Commission will not allow its stamp of approval on a test method that is confusing or misleading to consumers.

161.    The U.S. Congress has also recognized the scientific consensus on absence of a reduction in disease risk with the use of low tar cigarettes in the recent legislation giving the Food and Drug Administration jurisdiction over tobacco products.  That legislation explicitly banned the use of descriptors such as "light," "mild" or "low tar" in the naming of tobacco brands and the marketing of cigarette products.  In the findings of the bill, it lists:

> (38)    As the National Cancer Institute has found, many smokers mistakenly believe that "low tar" and "light" cigarettes cause fewer health problems than other cigarettes. As the National Cancer Institute has also found, mistaken beliefs about the health consequences of smoking "low tar" and "light" cigarettes can

reduce the motivation to quit smoking entirely and thereby lead to disease and death.

(39)    Recent studies have demonstrated that there has been no reduction in risk on a population-wide basis from "low tar" and "light" cigarettes, and such products may actually increase the risk of tobacco use.

(40)    The dangers of products sold or distributed as modified risk tobacco products that do not in fact reduce risk are so high that there is a compelling governmental interest in ensuring that statements about modified risk tobacco products are complete, accurate, and relate to the overall disease risk of the product.

(41)    As the Federal Trade Commission has found, consumers have misinterpreted advertisements in which one product is claimed to be less harmful than a comparable product, even in the presence of disclosures and advisories intended to provide clarification.

(42)    Permitting manufacturers to make unsubstantiated statements concerning modified risk tobacco products, whether express or implied, even if accompanied by disclaimers would be detrimental to the public health.

(43)    The only way to effectively protect the public health from the dangers of unsubstantiated modified risk tobacco products is to empower the Food and Drug Administration to require that products that tobacco manufacturers sold or distributed for risk reduction be reviewed in advance of marketing, and to require that the evidence relied on to support claims be fully verified.

162.    The World Health Organization Framework Convention on Tobacco Control, an international treaty on the regulation and control of tobacco products, also requires a ban on misleading terms such as "mild" and "light."

163.    The absence of meaningful differences in smoke exposure when different brands of cigarettes are smoked, alongside the resulting absence of reduction in risk, makes the marketing of these cigarettes as "lights" or as "safer" a deception to the smokers who use them or may consider using them.

164.     The reality that many smokers switched to light cigarettes rather than quit, as was the intent of the tobacco industry, means that they have foregone the opportunity to quit, a change that would have produced real reductions in disease risk.

**G.      Over the Past 50 Years, Cigarettes Have Become More Dangerous, Despite Defendants' Claims That Design Changes Have Reduced Health Risks.**

165.     In the first half of the 20th century, cigarettes were simpler than they are now. They had no filters, no vent holes, and fewer added chemicals. By the time the first Surgeon General's Report on Smoking and Health came out in 1964, cigarettes were much more complex.

166.     Cigarettes have become even more complex, and the risks from smoking have become more deadly over time.

167.     In 2001, the National Cancer Institute concluded in Monograph 13:

1.      Epidemiological and other scientific evidence, including patterns of mortality from smoking-caused diseases, does not indicate a benefit to public health from changes in cigarette design and manufacturing over the last fifty years.

2.      For spontaneous brand switchers, there appears to be complete compensation for nicotine delivery, reflecting more intensive smoking of lower yield cigarettes.

3.      Widespread adoption of lower yield cigarettes in the United States has not prevented the sustained increase in lung cancer among older smokers.

4.      Many smokers switch to lower yield cigarettes out of concern for their health, believing these cigarettes to be less risky or to be a step toward quitting. Advertising and marketing of lower yield cigarettes may promote initiation and impede cessation, more important determinants of smoking related diseases.

5.      Measurements of tar and nicotine yields using the FTC method do not offer smokers meaningful information on the amount of tar and nicotine they will receive from a cigarette. The measurements also do not offer meaningful information on the

relative amounts of tar and nicotine exposure likely to be received from smoking different brands of cigarettes.

168. The conclusions of the chapter on disease risk (chapter 4) for Monograph 13 are:

1.    Changes in cigarette design and manufacturing over the last fifty years have substantially lowered the sales-weighted, machine-measured tar and nicotine yields of cigarettes smoked in the United States.

2.    Cigarettes with low machine-measured yields by the FTC method are designed to allow compensatory smoking behaviors that enable a smoker to derive a wide range of tar and nicotine yields from the same brand, offsetting much of the theoretical benefit of a reduced-yield cigarette.

3.    Existing disease risk data do not support making a recommendation that smokers switch cigarette brands. The recommendation that individuals who cannot stop smoking should switch to low yield cigarettes can cause harm if it misleads smokers to postpone serious efforts at cessation.

4.    Widespread adoption of lower yield cigarettes by smokers in the United States has not prevented the sustained increase in lung cancer among older smokers.

5.    Epidemiological studies have not consistently found lesser risk of diseases, other than lung cancer, among smokers of reduced yield cigarettes. Some studies have found lesser risks of lung cancer among smokers of reduced yield cigarettes. Some or all of this reduction in lung cancer risk may reflect differing characteristics of smokers of reduced-yield compared to higher-yield cigarettes.

6.    There is no convincing evidence that changes in cigarette design between 1950 and the mid-1980s have resulted in an important decrease in the disease burden caused by cigarette use either for smokers as a group or for the whole population.

169. In 2004, the Surgeon General's Report concluded in the Message from the

Secretary of Health and Human Services at the front of that Report:

"Changes in cigarettes that reduce machine yields of tar and nicotine have not had any clear benefit for public health."

And the third major conclusion of that Report reads:

"Smoking cigarettes with lower machine-measured yields of tar and nicotine provides no clear benefit to health."

170.    Changes in cigarette design over the past 50 years have not only failed to decrease health risks, but have in fact made cigarettes more dangerous.

171.    Between 1959 and 2010, lung cancer risks for smokers rose dramatically.

172.    Among female smokers, risk increased 10-fold.

173.    Among male smokers, risk doubled.

174.    These increases occurred even though smokers in 2000 through 2010 smoked fewer cigarettes a day than earlier smokers.

175.    The risk for lung cancer in people who never smoked stayed about the same between 1959 and 2010.

176.    Evidence suggests that ventilated filters may have contributed to higher risks of lung cancer by enabling smokers to inhale more vigorously, thereby drawing carcinogens contained in cigarette smoke more deeply into lung tissue.

177.    Changes in the design and composition of cigarettes since the 1950s have increased the risk of adenocarcinoma of the lung, the most common type of lung cancer.

178.    At least 70 of the chemicals in cigarette smoke are known carcinogens. Levels of some of these chemicals have increased as manufacturing processes have changed.

**H.**     **For Decades, Defendants Have Marketed Cigarettes to Children and Young Adults To Secure Replacement Smokers.**

179.     For decades, the cigarette industry has been encouraging children and young adults to start smoking.

180.     Information explicitly revealed in industry documents makes clear Defendants' interest in and efforts to entice young people to use their products:

> "Smoking a cigarette for the beginner is a symbolic act. . . . 'I am no longer my mother's child, I'm tough, I am an adventurer, I'm not square.' . . . As the force from the psychological symbolism subsides, the pharmacological effect takes over to sustain the habit." 1969 draft report "Why One Smokes" to the PM Board of Directors prepared by Osdene's department.  Document Bates No. 1003287836.

> "Long after adolescent preoccupation with self-image has subsided, the cigarette will even preempt food in times of scarcity on the smoker's priority list."  November 26, 1969 presentation to the PM Board of Directors, "Smoker Psychology Research."  Bates No. 1000273741.

> "Marlboro's phenomenal growth rate in the past has been attributable in large part to our high market penetration among young smokers ... 15 to 19 years old . . . my own data, which includes younger teenagers, shows even higher Marlboro market penetration among 15-17-year-olds."   May 21, 1975 report "The Decline in the Rate of Growth of Marlboro Red" from PM researcher Myron E. Johnston to Robert B. Seligman.  Bates No. 2022849875-9880.

> "It is important to know as much as possible about teenage smoking patterns and attitudes. Today's teenager is tomorrow's potential regular customer and the overwhelming majority of smokers first begin to smoke while in their teens.  . . . The smoking patterns of teen-agers are particularly important to Philip Morris. . . the share index is highest in the youngest group for all Marlboro and Virginia Slims packings.  At least a part of the success of Marlboro Red during its most rapid growth period was because it became the brand of choice among teenagers who then stuck with it as they grew older."  March 31, 1981 market research report on young smokers titled "Young Smokers Prevalence, Trends, Implications, and

Related Demographic Trends," written by Philip Morris researcher Myron E. Johnston and approved by Carolyn Levy and Harry Daniel.  Bates No. 1000390803.

"We will no longer be able to rely on a rapidly increasing pool of teenagers from which to replace smokers through lost normal attrition. . . Because of our high share of the market among the youngest smokers Philip Morris will suffer more than the other companies from the decline in the number of teenage smokers." March 31, 1981 market research report on young smokers titled "Young Smokers Prevalence, Trends, Implications, and Related Demographic Trends," written by Philip Morris researcher Myron E. Johnston and approved by Carolyn Levy and Harry Daniel.  Bates No. 1000390803.

"I have just received data on the graduating class of 1982 and the results are much more encouraging and corroborate the Roper data [a survey that tracked smoking trends] . . . These data show that smoking prevalence among these 18-year-old high school seniors has increased from 1981 to 1982."  February 19, 1983 Philip Morris interoffice memo, "Still More on Trends in Cigarette Smoking Prevalence."  Bates No. 2022849870.

"The ability to attract new smokers and develop them into a young adult franchise is key to brand development."  1999 Philip Morris report, "Five-Year Trends 1988-1992." Bates No. 2044895379-484.

"In view of the need to reverse the preference for Marlboros among younger smokers, I wonder whether comic strip type copy might get a much higher readership among younger people than any other type of copy." April 12, 1973 RJR marketing memo, "The Following are the Principle Thoughts Which I Had..." Bates No. 500165434-5439.

"Pre-smokers."  Term used in a1973 RJR draft paper to describe youth smokers when they are just trying cigarettes, "Some Thoughts About New Brands of Cigarettes For the Youth Market." Bates No. 502987357-7368.

"At the outset it should be said that we are presently, and I believe unfairly, constrained from directly promoting cigarettes to the youth market; that is, to those in the approximately twenty-one year old and under group. Statistics show, however, that large, perhaps even increasing, numbers in that group are becoming smokers each year, despite bans on promotion of cigarettes to them.  If this be so, there is certainly nothing immoral or unethical about our Company attempting to attract those smokers to our products...Realistically, if our Company is to survive and prosper, over the long term we must

get our share of the youth market." A 1973 RJR draft paper, "Some Thoughts About New Brands of Cigarettes For the Youth Market." Bates No. 502987357-7368.

"The fragile, developing self-image of the young person needs all the support and enhancement it can get. Smoking may appear to enhance that self-image in a variety of ways. If one values, for example, an adventurous, sophisticated, adult image, smoking may enhance ones self-image...This self image enhancement effect has traditionally been a strong promotional theme for cigarette brands and should continue to be emphasized." 1973 RJR draft paper, "Some Thoughts About New Brands of Cigarettes For the Youth Market." Bates No. 502987357-7368.

"They represent tomorrow's cigarette business. . . As this 14-24 age group matures, they will account for a key share of the total cigarette volume -- for at least the next 25 years." September 30, 1974 R.J. Reynolds Tobacco Co. marketing plan presented to the company's Board of Directors. Bates No. 501421310-1335.

"Our attached recommendation to expand nationally the successfully tested 'Meet the Turk' ad campaign and new Marlboro-type blend is another step to meet our marketing objective: To increase our young adult franchise. To ensure increased and longer-term growth for CAMEL FILTER, the brand must increase its share penetration among the 14-24 age group which have a new set of more liberal values and which represent tomorrow's cigarette business." January 23, 1975 RJR memo from Mr. C.A. Tucker. Bates No. 505775557-5557.

"Evidence is now available to indicate that the 14-to-18- year-old group is an increasing segment of the smoking population. RJR-T must soon establish a successful new brand in this market if our position in the industry is to be maintained over the long term." 1976 Claude Teague draft report, "Planning Assumptions and Forecast for the Period 1977-1986 for R.J. Reynolds Tobacco Company." Bates No. 502819513-9532.

"Younger adult smokers have been the critical factor in the growth and decline of every major brand and company over the last 50 years. They will continue to be just as important to brands/companies in the future for two simple reasons: The renewal of the market stems almost entirely from 18-year-old smokers. No more than 5 percent of smokers start after age 24. [And] the brand loyalty of 18-year-old smokers far outweighs any tendency to switch with age... Brands/companies which fail to attract their fair share of younger adult smokers face an uphill battle. They must

achieve net switching gains every year to merely hold share...
Younger adult smokers are the only source of replacement
smokers... If younger adults turn away from smoking, the industry
must decline, just as a population which does not give birth will
eventually dwindle." February 29, 1984 RJR report, "Young Adult
Smokers: Strategies and Opportunities." Bates No.
501928462-8550.

"Overall, Camel advertising will be directed toward using peer
acceptance/influence to provide the motivation for target smokers to
select Camel." March 12, 1986 letter, "Camel New Advertising
Campaign Development." Bates No. 503969238-9242.

"[Camel advertising will create] the perception that Camel smokers
are non-conformist, self-confident and project a cool attitude, which
is admired by their peers. . . Aspiration to be perceived as cool/a
member of the in-group is one of the strongest influences affecting
the behavior of younger adult smokers." March 12, 1986 letter,
"Camel New Advertising Campaign Development." Bates No.
503969238-9242.

"We're adults. You've got a group of talented kids. Hence this
letter. We have been asked by our client to come up with a package
design… a design that is attractive to kids… While this cigarette is
geared to the youth market, no attempt (obvious) can be made to
encourage  persons under twenty-one to smoke. The package
design should be geared to attract the youthful eye… not the
ever-watchful eye of the Federal Government." August 13, 1970
letter from Lorillard advertising account executive to a marketing
professor, soliciting help from his students with advertising design.
Bates No. 92352889.

"Our profile taken locally shows this brand [Newport] being
purchased by black people (all ages), young adults (usually college
age), but the base of our business is the high school student."
August 30, 1978 Lorillard memo from Achey to CEO Curtis Judge
about the "fantastic success" of Newport. Bates No. TINY0003062.

"It's a well-known fact that teen-agers like sweet products. Honey
might be considered." September 1972 memo to Brown &
Williamson from Marketing Innovations, "Youth Cigarette -New
Concepts." Bates No. 170042014.

"The studies reported on youngsters' motivation for starting, their
brand preferences, etc., as well as the starting behavior of children
as young as 5 years old. . . The studies examined examination [sic]
of young smokers' attitudes towards 'addiction,' and contain

multiple references to how very young smokers at first believe they cannot become addicted, only to later discover, to their regret, that they are."  1980 report, "Apparent Difficulties and Relevant Facts." Bates No. 689753864.

"The purpose of this research was to gain insight into the perceptions, attitudes and behavior of younger, recently-starting smokers regarding initial product usage, current smoking and health concerns. . . . As long as young people are curious, anticipatory of adulthood and seek bravado, cigarettes will be tried."  1974 report, "Young Adult Smoker Lifestyles and Attitudes."  Bates No. 170040977.

181.    Advertising and promotional activities by cigarette companies have been shown to cause the onset and continuation of smoking among adolescents and young adults.

182.    Defendants have changed the packaging and design of their products in ways that have increased these products' appeal to adolescents and young adults.

183.    Images that make smoking appealing to children are still highly visible in our society.

184.    As a result of tobacco industry marketing and other influences, more than 3,200 children younger than the age of 18 smoke their first cigarette every day.

185.    Another 2,100 youth and young adults who are occasional smokers become daily smokers.

186.    Nearly 9 out of 10 smokers start before the age of 18, and 98% start smoking by age 26.

187.    Every adult who dies early because of smoking is replaced by two new young smokers; if current risks hold, one of the two also will die early from smoking.

I.      **Impact of *Engle v. Liggett Group, Inc.* Findings**

188.    In approving the *Engle* Phase I class certification and trial, but ordering post Phase I class decertification, the Florida Supreme Court provided Plaintiff the opportunity to complete unresolved damages claims.

189.    The Florida Supreme Court held, *inter alia,* "that it was proper to allow the jury to make findings in Phase I on Questions 1 (general causation), 2 (addiction of cigarettes), 3 (strict liability), 4(a) (fraud by concealment), 5(a) (civil-conspiracy-concealment), 6 (breach of implied warranty), 7 (breach of express warranty), and 8 (negligence). Therefore, these findings in favor of the *Engle* class can stand."  The Court further held that specified liability and general causation findings by the *Engle* jury did not need to be proved again, as they shall be given preclusive effect. Consequently, Plaintiff brings this action upon the limited remaining issues in dispute, to-wit: specific causation, apportionment of damages, comparative fault, compensatory damages, entitlement to punitive damages, and punitive damages.

190.    Decedent purchased, smoked, and was addicted to cigarette products manufactured and sold by Defendants which were the subject of *Engle*.  These cigarettes were designed, manufactured, advertised, marketed, and sold by Defendants at all times material to these claims.

191.    At all times relevant to this action, Decedent herein:

        a.      was addicted to, purchased, and smoked cigarettes containing nicotine that were designed, manufactured, advertised, and marketed by one or more of the Defendants, and

        b.      did so in sufficient quantities and for a sufficient time period to cause or substantially contribute to causing injury or aggravation of a pre-existing condition in the form of

diseases and medical conditions, including the form of diseases and medical conditions that ultimately resulted in the injuries to Decedent.

192.    As a direct and proximate result of smoking cigarettes manufactured and sold by Defendants, Decedent suffered from *Engle* diseases.  Decedent's *Engle* diseases and related medical conditions were a result of Decedent's addiction to cigarettes that contain nicotine, Decedent suffered from the *Engle* diseases and related medical conditions during the class period, and Decedent's *Engle* diseases caused the injuries described herein.

193.    Decedent's actions in using Defendants' cigarettes as marketed and intended by Defendants, and the frequency, duration, and manner of Decedent's efforts to cease smoking, should be considered by the jury along with Defendants' acts and omissions, for purposes of determining whether Decedent's acts or omissions rise to the level of negligence and constitute comparative fault; however, not with respect to the counts constituting gross negligence or intentional torts as pled in this action.  Any such negligence by Decedent, however, was not a legal cause of Decedent's death.

194.    As a direct and proximate result of Decedent's addiction to and consequent smoking of Defendants' cigarettes, Decedent suffered *Engle* diseases which caused mental and emotional pain, medical and financial expenses, shortened life expectancy, and death.  Decedent claims all damages allowed by law.

195.    The threshold requirement for pleading punitive damages have been previously met in the *Engle* Phase I proceeding.

## COMMON LIABILITY FINDINGS

196.   Plaintiff asserts the jury findings in the Phase I *Engle* trial, which were given preclusive effect by the Florida Supreme Court, including but not limited to the following:

a.   Smoking cigarettes causes aortic aneurysm, bladder cancer, cerebral vascular disease, cervical cancer, chronic obstructive pulmonary disease, coronary heart disease, esophageal cancer, kidney cancer, laryngeal cancer, lung cancer (specifically, adenocarcinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma), complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer, peripheral vascular disease, pharyngeal cancer, and stomach cancer.

b.   Nicotine is addictive.

c.   All of the Defendants placed cigarettes on the market that were defective and unreasonably dangerous.

d.   All of the Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.

e.   All of the Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.

f.   All of the Defendants sold or supplied cigarettes that were defective.

      g.     All Defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by Defendants.

      h.     All of the Defendants were negligent.

## DISCOVERY RULE, FRAUDULENT CONCEALMENT, AND TOLLING

197.    At all relevant times, Defendants knew about, but concealed, defects in their products and, consequently, cannot rely on any statutes of repose or limitations to bar Plaintiff's and Decedent's claims.

198.    Plaintiff and Decedent reasonably relied on Defendants' misrepresentations, lies, and omissions to their detriment, and such reliance caused Plaintiff and/or Decedent to delay in bringing suit.

199.    Plaintiff and Decedent did not discover sooner, nor reasonably could have discovered sooner, all of the elements set forth in this action, despite the exercise of due diligence, due to Defendants' continued concealment of the defects in their products and conspiracy to engage in fraudulent concealment.

200.    At all relevant times, Defendants had more knowledge than Plaintiff and Decedent regarding the nature of their products and efforts to conceal material facts about the dangers of their products.

201.    To this day, Defendants continue to conceal material facts regarding the addictive nature and dangers of their products.

202.    To this day, Defendants continue to lie and conceal material facts regarding their past fraudulent concealment and conspiracy to engage in fraudulent concealment.

203.    Due to Defendants' fraudulent concealment and conspiracy, Decedent was lulled into inaction, and consequently, Defendants are equitably estopped from asserting any statute of repose or limitations defense.

204.    Plaintiff and Decedent did not discover, nor reasonably could have discovered with reasonable diligence, at any earlier time, that any of Decedent's *Engle* diseases were caused by cigarettes.

## CLAIM I FOR STRICT LIABILITY

205.    Plaintiff hereby incorporates by reference all previous paragraphs 4-66, 70-71, 91-136, 145-162, 167-169, 190-195, and 196 (a)-(c), (f) as though alleged fully in this Cause of Action.

206.    With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that the cigarettes sold and placed on the market by Defendants were defective and unreasonably dangerous.

207.    Defendants manufactured, designed, marketed, and sold a product, and took actions and declined to take others, in such a manner that caused injury and, in doing so, their actions were so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effects of such conduct, including Decedent; showed such an entire lack of care that each Defendant must have been consciously indifferent to the consequences; showed such an entire lack of care that each Defendant must have wantonly or recklessly disregarded the safety and welfare of the public, including Decedent; and showed such reckless indifference to the rights of others, including Decedent, as to be the intentional violation of those rights, and thereby warranting punitive damages.

208.    Defendants had actual knowledge of the wrongfulness of such conduct and the high probability that injury or damage to Decedent would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in such injury and damage.  Defendants' conduct, jointly and severally, was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct, including Decedent, and thereby warranting punitive damages.

209.    As a direct and proximate result of the foregoing, Decedent suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, punitive damages, and all other relief this Court deems appropriate.

## CLAIM II FOR CIVIL CONSPIRACY TO FRAUDULENTLY CONCEAL

210.    Plaintiff hereby incorporates by reference all previous paragraphs 4-169, 190-192, 194-195, 196  (a), (b), (d), (e), (g), and 207-208 as though alleged fully in this Cause of Action.

211.    With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that Defendants, the Council, the Institute, and TIRC agreed to conceal or omit information regarding the health effects of cigarettes, or their addictive nature, with the intention that smokers (including Decedent) and the public would rely on this information to their detriment.

212.    Defendants' actions, and those of the Council, the Institute, and TIRC, constitute a successful conspiracy to commit fraud.

213.    Decedent relied to his detriment on, and his efforts to quit smoking were hindered

as a result of, Defendants' lies and omissions about the health effects and addictive nature of smoking, and the nature and properties of their cigarettes.

214.    As a direct and proximate result of the foregoing, Decedent suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, punitive damages, and all other relief this Court deems appropriate.

## CLAIM III FOR FRAUDULENT CONCEALMENT

215.    Plaintiff hereby incorporates by reference all previous paragraphs 4-169, 190-192, 194-195, 196 (a)-(h), and 207-208 as though alleged fully in this Cause of Action.

216.    With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes, or both.

217.    Defendants' actions constitute fraud.

218.    Decedent relied to his detriment on, and his efforts to quit smoking were hindered as a result of, Defendants' lies and omissions about the health effects and addictive nature of smoking, and the nature and properties of their cigarettes.

219.    As a direct and proximate result of the foregoing, Decedent suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, punitive damages, and all other relief this Court deems appropriate.

## CLAIM IV FOR NEGLIGENCE/GROSS NEGLIGENCE

220.    Plaintiff hereby incorporates by reference all previous paragraphs 4-169, 190-195, 196 (a)-(h), and 207-208 as though alleged fully in this Cause of Action.

221.    With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that all Defendants were negligent and grossly negligent.

222.    Defendants manufactured, designed, marketed, and sold cigarettes, and breached the duty of care that they owed to consumers such as Henry Gray.  Henry Gray's decision to take up smoking and his efforts to quit smoking were impacted as a result of Defendants' actions and their lies and omissions about the health effects and addictive nature of smoking, and the nature and properties of their cigarettes, which occurred as a result of, and were taken in furtherance of, the over 50-year conspiracy in which Defendants engaged, and which was still ongoing at the time of Henry Gray's death.  The actions and omissions taken by Defendants constituted negligence and gross negligence.

223.    As a direct and proximate result of the foregoing, Decedent suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, punitive damages, attorneys' fees, and all other relief this Court deems appropriate.

## CLAIM V FOR BREACH OF EXPRESS WARRANTY

224.    Plaintiff re-alleges all previous paragraphs as though fully set forth herein.

225.    With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that cigarettes sold and placed on the market by Defendants were defective and breached Defendants' express warranty.

226.    As a direct and proximate result of the foregoing, Decedent and/or Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, and all other relief this Court deems appropriate.

## CLAIM VI FOR BREACH OF IMPLIED  WARRANTY

227.    Plaintiff re-alleges all paragraphs as though fully set forth herein.

228.    With respect to smoking and health, and the manufacture, marketing, and sale of their cigarettes, the *Engle* Phase I findings conclusively establish that cigarettes sold and placed on the market by Defendants were defective and breached Defendants' implied warranty.

229.    As a direct and proximate result of the foregoing, Decedent and/or Plaintiff suffered the injuries described herein.

WHEREFORE, Plaintiff demands judgment for damages, including costs, interest as applicable, attorneys' fees, and all other relief this Court deems appropriate.

## CAUSATION AND DEMAND

230.    As a proximate result of the actions and omissions of Defendants as stated above, Decedent, each Survivor, and the Estate have suffered damage and injury including medical and funeral expenses, loss of support and services, mental pain and suffering, interest, and expenses, as defined in the Florida Wrongful Death Act.

231.    Plaintiff independently and alternatively asserts injury claims for survival damages pursuant to Section 46.021, Florida Statutes, as Decedent suffered severe permanent bodily injury, pain and suffering, mental anguish, loss of capacity for the enjoyment of life, lost earnings, the ability to earn money, and medical expenses for care and treatment.

232.    Plaintiff demands a trial by jury on all issues so triable.

## GENERAL PRAYER FOR RELIEF

Plaintiff demands judgment against each Defendant and every one of them for: compensatory damages for all injuries and losses described above under the Wrongful Death Act and the Survival Statute; punitive damages; all recoverable costs of this action; all legally recoverable interest; and any other relief to which each Plaintiff may be legally or equitably entitled, respectively.

Dated:  February 28, 2014                    Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

_____/s/ Robert J. Nelson_____
Robert J. Nelson

| | |
|---|---|
| Kathryn E. Barnett | Elizabeth J. Cabraser |
| Tennessee Bar No. 15361 | California Bar No. 83151 |
| Kenneth S. Byrd | Richard M. Heimann |
| Tennessee Bar No. 23541 | California Bar No. 063607 |
| LIEFF CABRASER HEIMANN & | Robert J. Nelson |
| BERNSTEIN, LLP | California Bar No. 132797 |
| 150 Fourth Avenue North | Sarah R. London |
| One Nashville Place, Suite 1650 | California Bar No. 267083 |
| Nashville, Tennessee  37219 | LIEFF CABRASER HEIMANN & BERNSTEIN, LLP |
| Telephone:  (615) 313-9000 | 275 Battery Street, 29th Floor |
| Facsimile:  (615) 313-9965 | San Francisco, California  94111 |
| E-mail:  kbarnett@lchb.com | Telephone:  (415) 956-1000 |
| E-mail:  kbyrd@lchb.com | Facsimile:  (415) 956-1008 |

Joseph F. Rice
Frederick C. Baker
Donald A. Migliori
Nathan D. Finch
James W. Ledlie
Elizabeth Smith
Lance V. Oliver
Rebecca M. Deupree
Lisa M. Saltzburg
Liza Ward
Sara Bryant
Michael Pendell
Matthew Jasinski
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450

Norwood S. Wilner
Janna B. Blasingame
Richard J. Lantinberg
THE WILNER FIRM
444 E. Duval Street, 2nd Floor
Jacksonville, FL  32202
Telephone: (904) 446-9817
Facsimile: (904) 446-9825

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

On February 28, 2014, I electronically filed this document through the ECF system, which will send a notice of electronic filing to all counsel of record.


       */s/  Robert J. Nelson*
       Robert J. Nelson